
# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff | § § | |
| vs. | § § | CIVIL ACTION NO. 3:03-CV-02912-D |
| MUTUALS.COM, INC., CONNELY DOWD MANAGEMENT, INC., MTT FUNDCORP, INC., RICHARD SAPIO, ERIC McDONALD, and MICHELE LEFTWICH, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael D. Napoli
State Bar No. 14803400

KIRKPATRICK & LOCKHART LLP
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201-6966
(214) 939-4900 (Telephone)
(214) 939-4949 (Facsimile)

ATTORNEYS FOR DEFENDANTS

OF COUNSEL:

Stephen G. Topetzes
KIRKPATRICK & LOCKHART LLP
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 778-9000 (Telephone)
(202) 778-9100 (Facsimile)

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT AND AUTHORITIES.........................................................................................5

I.     The Complaint Should Be Dismissed Because the Defendants Never Received Fair Notice that Their Alleged Conduct Might Be Deemed to Violate The Federal Securities Laws.......................................................................................................5

II.    The SEC Has Failed to State a Claim with Respect to Market Timing.............................7

      A.     The SEC Has Not Adequately Alleged That Defendants Made Material Misrepresentations in Connection With Mutual Fund Trades Submitted By Their Institutional Clients. ...................................................................................8

      B.     Defendants Had No Duty to Disclose the Identities of Their Customers and Thus, Did Not Commit Fraud by Failing to Do So.........................................11

      C.     The SEC has Failed to Allege Adequately That Defendants Acted With Scienter. .............................................................................................................13

III.   The SEC Has Failed to State a Claim For "Late Trading."............................................15

      A.     The Facts Pled in the Complaint Do Not Establish that Defendants Committed Fraud in Connection with Late Trading............................................15

      B.     The SEC Has Failed to State a Claim Under Rule 22c-1. .....................................16

IV.   The SEC Has Failed to State a Claim for Aiding and Abetting. .......................................18

V.    The SEC Has Failed to Plead its Claims with Sufficient Particularity..............................19

CONCLUSION.......................................................................................................................21

i

# TABLE OF AUTHORITIES

## CASES

*American National Bank & Trust Co. v. Allmerica Financial Life Insurance & Annuity Co.*,
2003 WL 22955999 (N.D. Ill. Dec. 12, 2003) ................................................................. 1, 5

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................................... 12

*Broad v. Rockwell International Corp.*,
642 F.2d 929 (5th Cir. *en banc*), cert. denied, 454 U.S. 965 (1981) ............................ 1, 14

*Butler v. Magellan Health Services, Inc.*,
101 F. Supp. 2d 1365 (M.D. Fla. 2000) ...................................................................... 1, 20

*In re Commonwealth Oil*,
467 F. Supp. 227 (W.D. Tex. 1979) ............................................................................ 1, 20

*Doe v. Dow Chemical Co.*,
343 F.3d 325 (5th Cir. 2003) ...................................................................................... 1, 20

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ....................................................................................................... 14

*Feldman v. Simkus Industrial, Inc.*,
492 F. Supp. 839 (N.D. Cal. 1980) .................................................................................. 18

*First Lincoln Holdings, Inc. v. The Equitable Life Assurance Society*,
164 F. Supp. 2d 383 (S.D.N.Y. 2001) ........................................................................... 1, 5

*Graham v. SEC*,
222 F.3d 994 (D.C. Cir. 2000) .................................................................................... 1, 18

*Grossman v. Novell*,
120 F.3d 1112 (10th Cir. 1997) ............................................................................. 1, 9, 11

*Hoxworth v. Blinder, Robinson & Co.*,
903 F.2d 186 (3d Cir. 1990) ....................................................................................... 1, 12

*Ingram Corp. v. J. Ray McDermott & Co., Inc.*,
698 F.2d 1295 (5th Cir. 1983) .................................................................................... 1, 20

*In re Initial Public Offering Litigation*,
2003 WL. 23096875 (S.D. N.Y. December 31, 2003) ............................................... 7, 8, 9

ii

*Landry v. FDIC,*
    486 F.2d 139 (3d Cir. 1973) ............................................................................. 18

*Ledesma v. Dillard Department Stores,*
    818 F. Supp. 983 (N.D. Tex. 1993) ......................................................... 1, 16

*Melder v. Morris,*
    27 F.3d 1097 (5th Cir. 1994) ........................................................................... 19

*Rand v. M/A- Com, Inc.,*
    824 F. Supp. 242 (D. Mass. 1992) ............................................................ 9, 10

*SEC v. Coffey,*
    493 F.2d 1304 (6th Cir. 1974) .................................................................. 10, 11

*SEC v. U.S. Environmental,*
    82 F. Supp. 2d 237 (S.D.N.Y. 2000) ............................................................... 7

*Schlesinger v. Herzog,*
    2 F.3d 135 (5th Cir. 1993) ............................................................................... 14

*Shushany v. Allwaste, Inc.,*
    992 F.2d 517 (5th Cir. 1993) ........................................................................... 14

*Trussell v. United Underwriters, Ltd.,*
    228 F. Supp. 757 (D. Colo. 1964) .................................................................. 13

*Tuchman v. DSC Communications Corp.,*
    14 F.3d 1061 (5th Cir. 1994) ............................................................. 14, 19, 20

*Upton v. SEC,*
    75 F.3d 92 (2nd Cir. 1996) ........................................................................ 5, 6, 7

*Windsor Securities, Inc. v. Hartford Life Insurance,*
    986 F.2d 655 (3rd Cir. 1993) ............................................................................ 5

*Woodward v. Metropolitan Bank,*
    522 F.2d 84 (5th Cir. 1975) ............................................................................. 18

## STATUTES

15 U.S.C. § 78p .................................................................................................. 13

17 C.F.R. § 220.22c-1(d) .................................................................................. 17

17 C.F.R. § 240.10b-5 ......................................................................................... 7

DA-113923 v1 0307572-0100

17 C.F.R. § 240.13d-1 ..................................................................................................13

17 C.F.R. § 270.22c-1(a) ............................................................................................17

Fed. R. Civ. P. 9(b) ....................................................................................................19

Fed. R. Civ. P. 12(b)(6) .........................................................................................15, 16

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ...................7

Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1).........................................7

Section 17(a) of the Securities Act of 1933 15 U.S.C. § 77q(a)......................................7

DA-113923 v1 0307572-0100

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:03-CV-02912-D |
| | § | |
| MUTUALS.COM, INC., CONNELY DOWD | § | |
| MANAGEMENT, INC., MTT FUNDCORP, | § | |
| INC., RICHARD SAPIO, ERIC McDONALD, | § | |
| and MICHELE LEFTWICH, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants MUTUALS.com, Inc. ("MUTUALS.com"), Connely Dowd Management ("CDM"), MTT Fundcorp, Inc. ("MTT"), Richard Sapio, Eric McDonald and Michele Leftwich respectfully submit this memorandum in support of their motion to dismiss the Complaint filed by the Securities and Exchange Commission ("SEC").

## INTRODUCTION

This case is one of a cluster of recent enforcement actions through which the SEC seeks to punish investors, brokers, mutual fund sponsors and investment advisers for conduct related to the legal, but controversial practice of "market timing." According to the SEC, market timing is "the practice of short-term buying and selling of mutual fund shares in order to exploit inefficiencies in mutual fund pricing." Complaint at ¶ 15. Notably, as the SEC concedes, market timing is not prohibited by any statute or regulation. *See id.* It is, however, extremely unpopular and politically incorrect in the current environment.

1

The SEC has known about the practice of mutual fund "market timing" for a long time. SEC staff members have spoken and written about issues related to market timing for years. In addition, so-called "market timers" openly formed and developed professional groups designed to promote market timing. The SEC did not adopt regulations to proscribe the practice at any time prior to or during the relevant period. Further, prior to the recent wave of regulatory actions directed at "market timing," the SEC did not commence any enforcement proceedings against "market timers" or the mutual fund companies and securities firms through or with which they traded. Instead, the SEC consistently has stated—as it reluctantly concedes in the Complaint—that "market timing" is not illegal.

However, in recent months, the SEC has been criticized for its failure to take steps to curb or prohibit market timing. *See e.g.* Deborah Solomon, *SEC Chairman Defends Decision to Quickly Settle Putnam Charges*, WALL STREET JOURNAL, November 18, 2003, at 2, *available at* 2003 WL-WSJ 68128643 ("The SEC has been under fire from both state regulators and congressional lawmakers who have criticized [it] for failing to uncover abuses in the fund industry sooner"); Tom Lauricella, *Update: Regulators Testify to Mutual Fund Abuse*, WALL STREET JOURNAL, November 4, 2003, at 1, *available at* 2003 WL-WSJ 3984563 ("Attorney General Eliot Spitzer ... last week bashed the SEC regulators overseeing the mutual fund industry as being 'asleep at the switch'"). Congress has held hearings to address issues related to market timing. And, for the first time, the SEC has instituted regulatory enforcement proceedings against "market timers," certain mutual fund companies that permitted or countenanced their activities, and securities firms or others who allegedly "facilitated" market timing. Defendants promptly ceased all activity related to alleged "market timing" by their clients after these regulatory concerns first surfaced in September 2003.

2

The instant case represents probably the most strained example of the recent enforcement efforts by the SEC. The corporate Defendants are securities firms through which a small number of "market timers" allegedly opened multiple accounts and placed unsolicited trades in mutual funds, some of which allegedly did not want to accept trades from "market timers." The individual Defendants are officers of the corporate defendants. Defendants are criticized for allegedly permitting clients to open multiple accounts, creating more than one internal identification number for certain persons associated with the defendant securities firms, and creating two affiliated broker-dealers (MTT and CDM), in an alleged effort to facilitate "market timing." Defendants are also criticized for allegedly failing to respect communications in or by which mutual fund companies stated, directly or indirectly, that they did not want to do business with "market timers." Significantly, there is no allegation that any of the Defendants directed or solicited any "market timing" by their institutional clients. There also is no allegation that any of the Defendants profited directly as a result of any alleged "market timing." Further, although allegations in the Complaint refer to e-mail communications that allegedly informed one or more Defendants that "market timing" by the firms' institutional clients was discouraged, there is no allegation that any of the Defendants had reason to believe that such trading, or conduct related to such trading, was or could be deemed illegal.

In its Complaint, the SEC attempts to contort a series of legal acts into a fraudulent scheme. Each specific act that Defendants are alleged to have committed is a legal act. It is perfectly permissible and not at all unusual for a client to have more than one account, for a broker to have multiple internal identification numbers and for a brokerage firm to have affiliates. At no point in its Complaint does the SEC allege that clients traded in accounts that were not their own, that someone associated with Defendants used an internal identifier that was

3

not his or her own, or that the common ownership of MUTUALS.com, MTT and CDM was concealed.

The SEC's skeletal allegations regarding alleged "market timing" and related "late trading" are defective on their face. First, and most fundamentally, the SEC's effort to cause this Court to sanction the Defendants for the alleged conduct related to "market timing" should be rejected because the SEC's current position that such practices are illegal was not reasonably communicated to the public during the relevant period. It is fundamentally unfair for the SEC now to seek to punish the Defendants for allegedly being associated with something that the SEC knew about, stated was legal and chose not to prohibit during the relevant period. Second, the SEC's claims under the antifraud provisions of the federal securities laws also fail because the SEC has not pled, and cannot plead, facts sufficient to show that Defendants made material misrepresentations or owed a duty to disclose any information they are alleged not to have disclosed regarding "market timing" by their institutional clients, and because the SEC has failed to allege adequately that the Defendants acted with scienter. Third, the SEC's bare allegations concerning supposed "late trading" are inadequate to support its claim pursuant to Rule 22c-1 under Investment Company Act of 1940. Fourth, the SEC has failed to plead facts adequate to support its allegations that the Defendants "aided and abetted" violations of the federal securities laws. Finally, the SEC's claims are defective because each of them sounds in fraud but the SEC has failed to set forth with reasonable particularity facts that would support its claims, as required by Rule 9(b) of the Federal Rules of Civil Procedure. In light of these pleading defects, the SEC has failed to state a cause of action against the Defendants and its Complaint should be dismissed.

4



<u>ARGUMENT AND AUTHORITIES</u>

**I.    The Complaint Should Be Dismissed Because the Defendants Never Received Fair Notice that Their Alleged Conduct Might Be Deemed to Violate The Federal Securities Laws.**

"Market timing" has always been, and remains today, a legal trading strategy that violates no public policy. *See American Nat'l Bank & Trust Co. v. Allmerica Financial Life Ins. & Annuity Co.*, 2003 WL 22955999 (N.D. Ill. Dec. 12, 2003) (holding that market timing violates no public policy and that a mutual fund could not restrict market timing in absence of a contractual provision authorizing such restrictions); *see also First Lincoln Holdings, Inc. v. The Equitable Life Assurance Society*, 164 F. Supp. 2d 383, 391 n. 9 (S.D.N.Y. 2001) (referring to market timing, the court observed "that the practice is not illegal."). To the extent that there is any restriction on an investor's ability to "market time" a mutual fund, it is strictly a function of the contract between the investor and the mutual fund. *See id.* Of course, the Defendants, who are alleged merely to have processed unsolicited trades from "market timers," are not parties to any such contract between the institutional investors and the mutual fund companies. Moreover, there is no allegation that the Defendants themselves had any contractual relationship with the mutual fund companies.

Whether market timing, or conduct that allegedly operates to "facilitate" market timing is good, bad or indifferent is not before this Court. The SEC has had ample opportunity to promulgate regulations on market timing. The Third Circuit noted more than ten years ago that the SEC has been aware of complaints by mutual funds about market timing since 1988. *See Windsor Securities, Inc. v. Hartford Life Ins.*, 986 F.2d 655, 666 (3rd Cir. 1993). Yet, in all that time, the SEC never indicated that market timing was illegal or improper. The SEC cannot now sanction the Defendants for doing what it has never held to be illegal. *See Upton v. SEC*, 75 F.3d

5

92, 98 (2nd Cir. 1996). To allow this case to continue would penalize the Defendants for taking actions that they did not have fair notice would be deemed regulatory violations. Such a result would be abhorrent to due process. *See id.*

In *Upton*, the Second Circuit held that an SEC enforcement action was improper because, like Defendants here, Upton had no prior notice that his conduct would violate the securities laws. Upton was the Chief Financial Officer of FCSC, a brokerage firm. Every week, acting pursuant to SEC Rule 15c3-3(e), Upton computed the amount of funds FCSC had to deposit into a special reserve bank account for the benefit of its customers, which amount hinged on whether FCSC's loans were secured or unsecured. Each week, just before computing the amount of the required deposit, FCSC would pay down the value of its secured loans and replace them with unsecured loans, thus reducing the amount of the deposit by as much as $40 million per week. Shortly after making the required deposit, FCSC would reverse this process. FCSC—along with many other brokerage firms who routinely engaged in this conduct—stopped the practice only after the SEC demanded that it do so. Subsequently, the New York Stock Exchange released an "Interpretation Memo" advising, for the first time, that the practice might violate Rule 15c3-3(e). Two years later, the SEC brought an enforcement action against Upton.

The Second Circuit held that the SEC's enforcement action against Upton was improper, because—despite that fact that Upton's conduct was clearly "manipulative"—Upton had no prior knowledge that such conduct violated Rule 15c3-3(e). The Second Circuit reasoned:

> Due process requires that 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.' Although the Commission's construction of its own regulation is entitled to 'substantial deference,' we cannot defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of its regulatory violation. ... [T]he Commission took no steps to advise the public that it believed the practice was questionable until August 23, 1989, after Upton had already stopped the practice.

DA-113923 v1 0307572-0100

> The Commission may not sanction Upton pursuant to a substantial change in its
> enforcement policy that was not reasonably communicated to the public.

75 F.3d at 98 (citations omitted).

This Court should prevent a similar injustice in this case. Like Upton, the Defendants here ceased processing trades for alleged "market timers" at or before the time the SEC raised regulatory or enforcement concerns respecting "market timing." Because Defendants did not have adequate notice of the SEC's position prior to that time, due process requires that the SEC's claims regarding alleged "market timing" be dismissed.

**II.    The SEC Has Failed to State a Claim with Respect to Market Timing.**

The SEC alleges that Defendants' activities with respect to alleged "market timing" by certain institutional clients violated three separate provisions of the securities laws: Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) (Count I); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (Count II); and Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1) (Count III). Although the elements of causes of action under these sections vary somewhat, each is directed to fraudulent conduct by those involved in the purchase and sale of securities. For present purposes, it is significant that each of these purported causes of action must rest upon allegations that Defendants made material misrepresentations or that Defendants made material omissions with respect to matters on which they had a duty to speak. *See SEC v. U.S. Environmental*, 82 F. Supp. 2d 237, 239 (S.D.N.Y. 2000); *see also In re Initial Public Offering Litigation*, 2003 WL 23096875 at *4 & n. 26 (S.D. N.Y. December 31, 2003). The SEC has not, and cannot, make such allegations in this case.

7

A. **The SEC Has Not Adequately Alleged That Defendants Made Material Misrepresentations in Connection With Mutual Fund Trades Submitted By Their Institutional Clients.**

The Complaint is long on the perceived evils of "market timing" and related allegations that the Defendants ignored complaints by their clearing broker and mutual fund companies about the "market timing" activities of their institutional clients. In contrast, however, it is remarkably devoid of any alleged misrepresentations by the Defendants that facilitated such mutual fund trading. Indeed, the Complaint contains no allegation that a particular statement by the Defendants was untrue.

The SEC's allegations that transaction sizes were kept small and that mutual funds were rotated "so that the same funds were not used over and over again," Complaint at ¶ 40, do not even speak to alleged misrepresentations. The same is true of allegations that the Defendants permitted certain institutional clients to "us[e] omnibus funds so that the trade is batched with other orders" or to execute trades through "multiple clearing firms, custodians and introducing broker/dealers." *Id.* In no such instance does the SEC allege that any of the Defendants made a false statement or misrepresentation. The related allegations that the Defendants permitted their institutional clients to maintain multiple accounts, *id.*, do not include specific factual averments that Defendants manufactured, or permitted their clients to manufacture, false tax identification numbers or other phony designations for those accounts. Notably, the SEC does not allege that any client of the Defendants actually used someone else's account or identifier to make trades; rather, the SEC nakedly alleges only that it may have been suggested that clients might or could do so. Complaint at ¶ 24. This generalized and unsupported allegation is insufficient to sustain a claim under any of the statutory provisions on which the SEC attempts to rely.

8

The SEC purports to give three examples of allegedly fraudulent transactions. Each is strained, and none is sufficient to state a cause of action against any of the Defendants. In the first example, the SEC alleges that Pioneer Investments instructed MUTUALS.com that it would not accept trades from two specific accounts. The SEC also alleges that MUTUALS.com permitted the client that owned those accounts to open new accounts through which it continued to trade Pioneer funds. Complaint at ¶ 25. Significantly, the SEC does not allege that MUTUALS.com used a false account number or that the Defendants simply changed the number of the existing accounts. Nor does the SEC allege that additional trading by the client was not, in fact, performed in the new accounts, as opposed to in the other accounts that had been "blocked." To the contrary, the SEC expressly pleads that the client traded in the new accounts. *Id.*

It is not clear what the SEC contends MUTUALS.com misrepresented in this situation. Although not pled, we could presume that MUTUALS.com transmitted an order to its clearing broker to effect a trade in a Pioneer mutual fund for a certain account, which account was identified by a number. An account number identifies a particular "lock box" for funds or securities within a broker's internal accounting system. A single customer may have several accounts. And, several customers can share one account.

There is no fraud here. According to the Complaint, the account numbers used did, in fact, belong to the customer on whose behalf MUTUALS.com processed the trades. Thus, to the extent that MUTUALS.com made any representation to a mutual fund by disclosing account numbers to its clearing broker, that representation was true. As such, it cannot support a claim for securities fraud based upon alleged misrepresentations. *See Grossman v. Novell*, 120 F.3d 1112, 1124 (10th Cir. 1997) (affirming dismissal of claims on the ground that "nowhere in the complaint are facts alleged showing that anything about these statements is false"); *Rand v. M/A-*

9

*Com, Inc.*, 824 F. Supp. 242, 256 (D. Mass. 1992) (holding that a statement that is literally true cannot support a claim for securities fraud).

In its second example, the SEC alleges that MUTUALS.com received an instruction from Pershing LLC ("Pershing"), its clearing broker-dealer, not to permit clients to "market time" Goldman Sachs mutual funds.  Complaint at ¶ 27.  MUTUALS.com complied with this instruction.  But, according to the Complaint, over a year after the clearing firm gave this instruction to MUTUALS.com, CDM and MTT (two broker-dealer affiliates of MUTUALS.com) allegedly processed "market timing" trades submitted by clients for the purchase of shares of Goldman Sachs mutual funds. *Id.*

Even assuming that what the SEC alleges is true, these facts do not support a fraud claim. The notion that two broker-dealers committed fraud by allegedly processing trades counter to an instruction provided to an affiliated securities firm more than one year earlier is specious.

Further, on the face of the Complaint, it is clear that nothing was misrepresented to Pershing, and Pershing is the only party with whom Defendants are alleged to have communicated regarding these matters.  The SEC does not and cannot allege that Pershing was unaware that MUTUALS.com, CDM and MTT were affiliated.  If Pershing cleared the trades that allegedly were placed through MTT and CDM more than one year after the supposed instruction to MUTUALS.com, it had to have a clearing agreement with all three broker-dealer Defendants (which it did) and, thus, Pershing knew that all three were affiliated.  Accordingly, Pershing – which allegedly instructed MUTUALS.com not to process additional "market timing" transactions in Goldman Sachs mutual funds – would have been aware that MTT and CDM were processing such transactions.  There could not have been an actionable misrepresentation by Defendants under these facts. *See SEC v. Coffey*, 493 F.2d 1304, 1313 (6th Cir. 1974) (holding

that there was not a violation of §17(a) or Rule 10b-5 where the recipient of the allegedly false representation "should already have been aware" of the truth).

On the other hand, even if Pershing did not clear the trades allegedly placed by MTT and CDM with Goldman Sachs mutual funds, this does not negate the undisputed reality that MUTUALS.com and the individual Defendants followed Pershing's instructions—i.e., MUTUALS.com, which allegedly was told more than one year earlier not to process additional transactions involving Goldman Sachs mutual funds, did not in fact process any further such transactions. The SEC has not alleged, and cannot allege, any actionable misrepresentation by Defendants regarding these matters.

In its third and final example, the SEC alleges that Defendants changed an internal registered representative number from 81 to 90 in order to avoid a bar placed by the ARTIX fund. Complaint at ¶ 29. The SEC further alleges that "registered representative No. 90 resumed trading in ARTIX shares." *Id*. Here again, the SEC has not identified a misrepresentation by any Defendant. According to the Complaint, the registered representative number accurately reflected the representative who was executing the trades in question. These allegations therefore cannot support a claim for securities fraud based upon alleged misrepresentations. *See Grossman*, 120 F.3d at 1124.

**B.** **Defendants Had No Duty to Disclose the Identities of Their Customers and Thus, Did Not Commit Fraud by Failing to Do So.**

The SEC implies throughout its fraud allegations that Defendants should have revealed, or disclosed more completely, the identities of their customers when processing mutual fund transactions. *See e.g.,* Complaint at ¶ 31 ("In assisting clients with their market timing activity, the defendants misrepresented and concealed their identity and the identities of their clients.") Specifically, the SEC appears to suggest that the Defendants should have disclosed that the

11

customer that owned Account A also owned Accounts B and C, etc. This apparent contention is groundless. There simply is no such duty. Nor does the SEC allege that such a duty exists. Without such a duty, the nondisclosure of information is not actionable under the provisions relied upon by the SEC.

The law is abundantly clear that not disclosing information, in contrast to making an affirmative misrepresentation, generally is not actionable under the antifraud provisions of the federal securities laws. *See, e.g., Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 200 n.19 (3d Cir. 1990) (discussing Section 10(b) and Rule 10b-5). Failing to disclose material information prior to the consummation of a transaction is fraudulent only when the party is under a duty to make such a disclosure. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule l0b-5."). Further, the duty to disclose arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Restatement (Second) of Torts, 551(2)(a) (1976).

The SEC does not allege that the Defendants had a duty to disclose the identity of the customer to which a particular account number was assigned. It also does not allege that Defendants had a duty to disclose the broker(s) to which a particular internal identification number was assigned. Thus, the Defendants' alleged failure to disclose such information could not have been an omission that violated the antifraud provisions of the securities laws.

Nor has the SEC alleged facts that would support the conclusion that Defendants had such a duty. According to the Complaint, Defendants, acting as an investment adviser or brokers for their customers, processed transactions in mutual fund shares in arms-length transactions between the customers and the funds. Complaint at ¶ 8. There is no duty of disclosure in arms-

12

length transactions such as these. *See Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757, 763 (D. Colo. 1964) (where the only relationship between stock purchasers and sellers was that of purchaser to seller, no fiduciary duty of full disclosure arose). The Complaint is devoid of any allegation that Defendants possessed a contractual or other relationship with any mutual fund that could conceivably have given rise to a duty to disclose such information. The SEC does not contend, and cannot contend, that any of the Defendants possessed a "fiduciary or similar relation of trust and confidence" with any mutual fund in which their institutional clients invested.

Notably, neither Congress nor the SEC has ever attempted to mandate such disclosure in the context of mutual fund trading. Both Congress and the SEC, of course, clearly are capable of requiring disclosure of identity in securities transactions. For example, pursuant to §16 of the Exchange Act, "insiders" must disclose their initial ownership of an issuer's securities, as well as subsequent transactions in these securities, via publicly available SEC filings. 15 U.S.C. § 78p. Similarly, the SEC requires that a purchaser who acquires beneficial ownership of five percent or more of a particular class of an issuer's securities must disclose both his identity and his ownership interest through a publicly available SEC filing. 17 C.F.R. § 240.13d-1.

The SEC has failed to state a claim against the Defendants based upon alleged omissions. Absent the existence of a duty to disclose, Defendants cannot be liable for allegedly concealing their identity or the identity of their customers. Given the lack of any relevant duty, or any alleged violation thereof, no liability for fraud may be imposed.

## C.   The SEC has Failed to Allege Adequately That Defendants Acted With Scienter.

With respect to its claims under Section 10(b) of the Exchange Act, Rule 10b-5, thereunder, and Section 17(a)(1) of the Securities Act, the SEC must allege adequately that the

DA-113923 v1 0307572-0100

Defendants acted with scienter. *See Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (regarding securities fraud claims under §10(b) and Rule 10b-5); *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir. 1993) ("all securities fraud claims require the plaintiff to establish ... scienter"). More specifically, the SEC must allege facts sufficient to show that Defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Such a showing must rest upon proof of either actual knowledge or that the Defendants acted with severe recklessness. *See Tuchman*, 14 F.3d at 1067. As stated by the Fifth Circuit, such "severe recklessness" is defined as:

> [T]hose highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.*, citing *Shushany*, 992 F.2d at 521 *and Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. *en banc*), *cert. denied*, 454 U.S. 965 (1981).

No such facts have been alleged in the Complaint. Lean and isolated allegations that an unnamed customer opened two new accounts through which it submitted a total of 12 trades with respect to a "family" of mutual funds that had indicated it did not want to receive additional trades from two previous accounts maintained by that customer, or that MTT and CDM processed trades submitted by clients with respect to Goldman Sachs mutual funds more than one year after a separate firm, MUTUALS.com, supposedly had been instructed by Pershing not to process further "market timing" transactions in such funds, hardly satisfy this burden. The same may be said for a bald and selective allegation that the Defendants changed a registered representative number supposedly to "circumvent [a] bar" imposed with respect to the ARTIX

14

fund. _See_ Complaint at ¶ 29. As noted above, there is no allegation that the Defendants made _any_ false statement in connection with these isolated matters.

The inadequacy of such allegations is further demonstrated by the underlying reality that the supposed objective of the alleged misconduct (i.e., "market timing") is, as the SEC concedes, legal. Moreover, as discussed above, the SEC has not alleged, and cannot allege, that the Defendants owed a duty to any mutual fund company that would have required additional disclosures regarding these matters.

In short, the Complaint will not support a finding of scienter. Accordingly, the SEC's claims under Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, as well as Section 17(a)(1) of the Securities Act, should be dismissed. Fed. R. Civ. P. 12(b)(6).

**III.    The SEC Has Failed to State a Claim For "Late Trading."**

According to the Complaint, "late trading" refers to the practice of receiving orders after the national markets closed at 4:00 pm EST and executing the orders as if they were received prior to the close of the market. _Id._ at ¶ 33. The SEC alleges that Defendants "facilitated the late trading of mutual fund shares on behalf of their clients" (Complaint at ¶ 32), in violation of the antifraud provisions and Rule 22c-1 under the Investment Company Act of 1940. .

**A.    The Facts Pled in the Complaint Do Not Establish that Defendants Committed Fraud in Connection with Late Trading.**

The SEC does not allege that the Defendants falsely represented when they received trading orders from their clients. Instead, the SEC alleges that the Defendants fraudulently concealed "late trading" activity through omissions. Complaint at ¶ 34. Specifically, the SEC alleges two omissions: (1) that the Defendants facilitated such trades by "omitting portions of the trading information that they were required to provide to their clearing agents," _id._; and (2) that Defendant MUTUALS.com failed to disclose to the mutual funds that it received trading

15

instructions from its clients after 4:00 pm EST, *id.* at ¶ 37. As discussed above, the SEC has failed to plead facts sufficient to establish a duty on the part of any of the Defendants to disclose this information. Accordingly, neither of these alleged omissions is sufficient to set forth a claim related to allegedly fraudulent "late trading."

Significantly, the SEC also did not allege that any undisclosed trading information was material. The absence of such an allegation may be interpreted to reflect that the allegedly undisclosed trading information was *not* material. *See Ledesma v. Dillard Dept. Stores*, 818 F. Supp. 983, 984 (N.D. Tex. 1993) ("If a Complaint omits facts concerning pivotal elements of the pleaders' claim, the court is justified in assuming the nonexistence of such facts."). That such trading information was immaterial is supported by common sense: if the clearing brokers and mutual funds required the information to process a trade, they would not have processed trades without that information. The SEC's allegations reflect that trades were processed without this so-called "required trading information," which demonstrates that the information was not required and, thus, not material.

Further, as discussed, the Complaint is utterly devoid of particular allegations regarding any alleged "late trading" by clients of the Defendants. The SEC wholly fails to identify a single "late trade" processed by the Defendants. This defect alone is fatal to the SEC's claims.

### B. The SEC Has Failed to State a Claim Under Rule 22c-1.

As part of its recent and ongoing efforts to reform the mutual fund industry, the SEC wants to prevent investors from profiting from market changes that are not reflected in a fund's share price, or net asset value per share ("NAV"). One contemplated reform involves an SEC proposal to change Rule 22c-1 under the Investment Company Act of 1940 in a manner that

16

effectively would force mutual fund trades to be placed before the market closes at 4:00 pm EST. *See* SEC Release No. IC-26288 (December 11, 2003). Whether this proposed reform is adopted is immaterial to this litigation. The fact of its proposal, however, is significant. The SEC's acknowledgement that the rule was ambiguous seriously compromises its purported late trading claim against the Defendants in this case. Presumably, if the Defendants and others had been on notice with respect to such a deadline for processing transactions, the SEC would not deem it necessary to clarify the deadline.

Contrary to the SEC's allegations, Rule 22c-1 does not impose a 4:00 pm EST deadline for mutual fund trades. In operative part, Rule 22c-1 provides that mutual fund shares must trade at a "price based on the current net asset value of such security which is next computed after receipt of tender of such security for redemption or of an order to purchase or sell such security." 17 C.F.R. § 270.22c-1(a). An order is deemed "received" by a mutual fund when a broker who is authorized to deal in that fund's shares receives the order. *See* SEC Release No. IC-5569 (December 27, 1968). Thus, to receive that day's price, the broker must receive the order prior to the time that the mutual fund computes its price.

Rule 22c-1 does not set a time or deadline by which a fund must compute its daily NAV. Instead, each fund is allowed to determine when it will calculate that day's NAV. 17 C.F.R. § 220.22c-1(d). Most funds calculate their NAV shortly after the close of the market (4:00 pm EST). *See* SEC Release No. IC-26288 (December 11, 2003) at n. 5. Funds wait until the market closes so that their daily NAV "reflects the closing prices of the securities [they] hold[]." *Id.* at n. 4. Therefore, in order to calculate its NAV based on actual closing prices, a mutual fund must wait until after the market closes to perform the calculation.

17

In this case, Defendants allegedly violated Rule 22c-1 by processing unspecified mutual fund trades that they received after 4:00 pm EST but before 4:30 pm EST.  Complaint at ¶ 35 (Defendants told their customers that they "had until 3:30 p.m. CST 'to get all trades in.'").  Even if true, these allegations do not establish a cause of action under Rule 22c-1.  To state a cause of action under Rule 22c-1, the SEC would have to also allege—at the very least—the time at which Defendants received each trade, as well as the time at which the relevant fund calculated its NAV.  The absence of such allegations renders this claim defective.  Count IV should therefore be dismissed.

**IV.   The SEC Has Failed to State a Claim for Aiding and Abetting.**

The SEC alleges that each of the Defendants aided and abetted violations of Rule 10b-5 and Section 10(b) by their clients and that the individual Defendants aided and abetted violations of Section 15(c)(1) by the corporate Defendants.  Complaint at ¶¶ 49, 53.  To prove aiding and abetting, the SEC must first establish a primary violation by a third party.  *See Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000); *Woodward v. Metro Bank*, 522 F.2d 84, 94-97 (5th Cir. 1975).  The SEC must also establish that the Defendants provided "substantial assistance" to the persons or entities that committed such violations.  *Id.*

As discussed above, the facts asserted by the SEC do not establish a primary violation of the securities laws by any of the Defendants.  Moreover, the allegations of the Complaint – which center on processing unsolicited trades submitted by clients engaged in something that is not illegal, and which do not involve a single instance of an alleged untrue statement by the Defendants – are inadequate to support a claim that the Defendants provided "substantial assistance" of the type required under the relevant case law.  *Landry v. FDIC*, 486 F.2d 139, 163 (3d Cir. 1973) (holding that broker that handled allegedly fraudulent trades did not render

18

substantial assistance); *Feldman v. Simkus Indus., Inc.,* 492 F. Supp. 839, 847 (N.D. Cal. 1980) (acting as a broker in fraudulent trades is not substantial assistance).   Accordingly, the SEC's aiding and abetting claims in Counts II and III should be dismissed.

**V.     The SEC Has Failed to Plead its Claims with Sufficient Particularity.**

Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).   The requirements of Rule 9(b) are designed to provide a defendant with fair notice of a plaintiff's claims, protect him from harm to his reputation and goodwill, reduce the number of strike suits and prevent a plaintiff from filing baseless claims and then attempting to discover unknown wrongs. *See Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir. 1994).

The requirement under Rule 9(b) that fraud be pled with particularity applies to each of the claims in the Complaint because they all sound in fraud. *See e.g. Melder,* 27 F.3d at 1100 ("When 1933 Securities Act claims are grounded in fraud rather than negligence as they clearly are here, Rule 9(b) applies.").   For example, the SEC couches its late trading allegations in the following terms:

> The Defendants concealed the late trading activity by omitting portions of the trading information they were required to provide to their clearing agents [and] failed to disclose to the mutual funds that they received trading instructions from clients after [the regulatory] deadline.

Complaint at ¶¶ 34, 37.

Courts have interpreted Rule 9(b) to require the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994).   Particularity is especially important in complex securities cases involving a period of years:

19

> Rule 9(b) requires that the defendants be informed of the facts which were omitted, the statements or documents from which they were omitted (at least by specific category), and why as a result of the omissions the statements made are believed to be misleading. Similarly, plaintiffs alleging that a certain statement was false or misleading must state the substance of the statement, the report or document in which the statement appeared, and in what respect it was misleading.

*In re Commonwealth Oil*, 467 F. Supp. 227, 252 (W.D. Tex. 1979). Conclusory allegations are not enough to meet this standard; a plaintiff—the SEC in this case—must allege particular facts. *See Tuchman*, 14 F.3d at 1067; *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1305 (5th Cir. 1983) (Rule 9(b) not met where there was not a single reference to any relevant misrepresentation); *Butler v. Magellan Health Services, Inc.*, 101 F. Supp. 2d 1365, 1369 (M.D. Fla. 2000) (alleging a scheme of fraud is not enough without any specific allegations of facts that would support such claims). "'[A]t a minimum ... [the SEC must allege] the who, what, when, where and how'" relating to the alleged fraud. *Doe v. Dow Chemical Co.*, 343 F.3d 325, 328 (5th Cir. 2003).

The lean allegations of the SEC's Complaint utterly fail to satisfy the pleading requirements of Rule 9(b). The SEC broadly alleges that the Defendants engaged in "thousands" of market timing transactions involving "hundreds" of mutual funds. Complaint at ¶ 19. But it only refers to two alleged incidents of so-called "market timing" activity, and even then states only in vague terms that twelve additional trades were consummated, Complaint at ¶ 25, and that an unnamed registered representative resumed trading in a certain fund, Complaint at ¶ 29. Such a pleading hardly puts the Defendants on notice with respect to their alleged fraud.

Plaintiff's allegations regarding late trading are even less specific. The SEC asserts that "late trading" was a "routine" practice, Complaint at ¶ 33, without providing a *single specific example* of such alleged "late trading." This pleading defect is striking. The SEC has failed to identify *a single trade* that Defendants allegedly received after the regulatory deadline and that

20

Defendants allegedly processed at an inappropriate price. The most that can be said of the SEC's allegations is that they purport to identify certain e-mail communications that suggest one or more Defendants *may have* processed trades received shortly after the regulatory deadline. Such allegations are plainly insufficient to support a claim against Defendants. Moreover, the SEC nakedly alleges that Defendants omitted certain information regarding trades submitted by their institutional clients, Complaint at ¶ 34, but fails to identify what that information was or why it was required.

Such a paucity of detail simply does not pass muster under Rule 9(b). The Complaint fails to provide Defendants with adequate notice regarding the fraud they allegedly committed. Accordingly, the Complaint should be dismissed in its entirety.

## <u>CONCLUSION</u>

ACCORDINGLY, Defendants' motion to dismiss should be granted.

Respectfully submitted,

Michael D. Napoli
State Bar No. 14803400

KIRKPATRICK & LOCKHART LLP
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201-6966
(214) 939-4900 (Telephone)
(214) 939-4949 (Facsimile)

ATTORNEYS FOR DEFENDANTS

OF COUNSEL:

Stephen G. Topetzes
KIRKPATRICK & LOCKHART LLP
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 778-9000 (Telephone)
(202) 778-9100 (Facsimile)

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing MEMORANDUM IN

SUPPORT OF DEFENDANTS' MOTION TO DISMISS was served this 20th day of February

2004, by first class mail, postage prepaid, on the following counsel of record:

J. Kevin Edmundson
U.S. Securities and Exchange Commission
Fort Worth District Office
801 Cherry Street, 19th Floor
Fort Worth, TX  76102

Michael D. Napoli

22